2021 IL App (2d) 180874-U
No. 2-18-0874
Order filed June 18, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-CF-516 |
| | ) | |
| STEPHAN A. RUSSELL, | ) ) | Honorable Daniel P. Guerin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Counsel's failure to seek introduction of favorable lineup evidence did not prejudice defendant such that his claim of ineffectiveness was viable; trial court did not abuse its discretion in admitting evidence that defendant and two witnesses were members of a gang for the limited purpose of assessing witness's bias; doctrine of invited error precluded defendant from challenging admission of lay-opinion regarding identity of person in surveillance recording and trial court did not abuse its discretion in allowing this testimony and lack of prophylactic procedures to guard against possible unfair prejudice did not prejudice defendant; counsel was not ineffective for failing to strike juror, stipulating to admissibility of surveillance video, or failing to interpose various objections; and defendant's sentence did not violate proportionate penalties clause of the Illinois Constitution.

¶ 2                                    I. INTRODUCTION

¶ 3     Following a jury trial in the circuit court of Du Page County, defendant, Stephan A. Russell, was convicted of first-degree murder and attempted armed robbery. He was sentenced to consecutive terms of imprisonment of 50 years and 5 years imprisonment, respectively. He now appeals, raising a number of issues. He raises several arguments concerning the effectiveness of the representation he received at trial and during a *Krankel* hearing (see *People v. Krankel*, 102 Ill. 2d 181 (1984)). He also contends that the trial court abused its discretion in allowing evidence of his gang affiliation as well as a lay opinion from a police officer regarding the identity of an individual depicted in a surveillance video recording. Finally, defendant asserts that his sentence of 50 years' imprisonment violates the proportionate penalties clause of the Illinois Constitution (see Ill. Const. art. 1, § 11). We find none of defendant's points well taken; therefore, we affirm.

¶ 4                                    II. BACKGROUND

¶ 5     Defendant was charged with six counts of first-degree murder based on the shooting death of Hussein Saghir. Based on the same incident, he was also charged with one count of the attempted armed robbery of Hussein Saghir and Ahmad Saghir. The jury found defendant guilty on all counts. Defendant raises issues regarding *voir dire* and a pretrial motion *in limine*. Facts pertinent to those arguments will be discussed when we analyze those issues.

¶ 6     On January 19, 2014, Hussein Saghir was shot and killed during an attempted robbery of the store at which he worked, Sam's Tobacco. Hussein and his brother, Ahmad Saghir were working to close the store. Two men approached the brothers outside the store and attempted to force them back inside. A struggle ensued, and Hussein was shot.

¶ 7     At trial, the following evidence was adduced. The State first called Hanan Faraj, the victim's wife. January 19, 2014, was her 40th birthday. The family had plans to celebrate with

their family that evening. Hussein went to the store at about 4 p.m. to help his brother close the store where they worked at, Sam's Tobacco. Hussein took his three-year-old nephew with him. Later that day, Hanan received a telephone call from the victim's brother, Ahmad, informing her of the shooting. She later learned that her husband had died.

¶ 8     Officer Calliendo of the Bensenville Police Department next testified for the State. He was working the afternoon shift on January 19, 2014. Shortly before 6 p.m., he received a dispatch to Sam's Tobacco, which he described as a typical convenience store. When he arrived, he saw a man standing near the front entrance "slumped over toward the door." Calliendo was the first to arrive at the crime scene. The victim was not responsive at that time. He started CPR. Other law enforcement officers and paramedics arrived. Calliendo subsequently secured video surveillance recordings from Sam's Tobacco.

¶ 9     The State then called James Murphy, who testified that he was a firefighter paramedic with the Bensenville Fire Protection District. He responded to Sam's Tobacco shortly before 6 p.m. on January 19, 2014. When he arrived, a number of police officers were tending to the victim. Murphy and his partner took over. Murphy noted a single gunshot wound just below the victim's right armpit. The victim was not breathing and had no vital signs. They continued treatment and transported the victim to Elmhurst Memorial Hospital. The victim never regained consciousness. Upon arrival at the hospital, they turned the victim over to emergency room staff. Shortly thereafter, emergency room staff pronounced the victim dead. In addition to the gunshot wound, Murphy also observed a bruise on the left side of the victim's body. He later learned that the bruise was "where the bullet ended up."

¶ 10     Between witnesses, the parties stipulated to the testimony a number of witnesses would give concerning the foundation of various video recordings. One of the stipulations concerned the

proposed testimony of the victim's brother, Ahmad Saghir regarding the surveillance recording made at Sam's Tobacco.

¶ 11    Michael Larson was the State's next witness. He testified that he is a detective with the Bensenville Police Department. On January 19, 2014, Larson responded to Sam's Tobacco. He "activated" the Du Page County major crimes task force to assist in the investigation. He identified a number of photographs of the crime scene and surrounding area. He noted what appeared to be a bullet hole near the front doorway of Sam's Tobacco and subsequently recovered a bullet. Police never recovered the weapon used in the murder. They were able to recover security recordings from both inside and outside the store. There is a segment showing the murder. Part of the recording was released to the public. On February 7, 2014, two individuals who wished to remain anonymous provided the police with a tip. As a result of that tip, the police attempted to locate Kenneth Bardlett. Bardlett was taken into custody the next day. As a result of information Bardlett provided on February 12, 2014, Larson and other officers recovered surveillance recordings from a BP gas station and a currency exchange in Chicago. They also obtained a recording from a store across from Sam's Tobacco. Shortly after his brother's murder, Ahmad moved to Lebanon.

¶ 12    On cross-examination, Larson agreed that the surveillance recording from Sam's Tobacco showed an individual in a "reddish hooded sweatshirt" holding a gun with his left arm raised at 5:48:45 p.m. The left side of the sweatshirt reads "Abercrombie." Larson stated he was familiar with Tremayne Davis. In the recording recovered from the BP gas station, Davis is seen wearing "what appears to be the exact same Abercrombie sweatshirt." On February 9, 2014, Larson and other officers executed a search warrant on Tremayne Davis's residence. They seized a white cotton belt from Davis's living quarters. Larson testified that on February 23, 2014, he went to 1417 North Lotus Street to execute a search warrant but did not seize any evidence.

¶ 13     On redirect-examination, Larson stated that he could identify the person in the Sam's Tobacco surveillance recording. Defense counsel objected when the State asked Larson who that individual was. The State countered that it was responding to defense counsel's questions about the identity of the person wearing the Abercrombie sweatshirt in the BP station video (Larson had testified that it was Davis in response to a question from defense counsel). Larson then testified that he had met Davis and defendant a number of times. Over objection, Larson identified the person in the Sam's Tobacco recording as defendant.

¶ 14     On recross-examination, Larson acknowledged that one could only see a small portion of the individual's face in the Sam's Tobacco recording. Moreover, the individual in that recording was wearing the Abercrombie sweatshirt that Davis was wearing in the BP station recording.

¶ 15     The State's next witness was Kenneth Bardlett. Bardlett refused to come to the court room and the trial judge issued a drag order to compel his presence. When brought to the court room, Bardlett initially stated that he would not speak until his attorney was present. Before Bardlett testified, the trial court read the following limiting instruction.

> "Evidence will be received that this witness is a member of a gang. This evidence will be received on the issues of any bias, interest or motive that the witness may have for his testimony and may be considered by you only for this limited purpose. It is for you to determine what weight should be given to this evidence on the issues of bias, interest or motive for the witness' testimony."

Bardlett acknowledged that he was a co-defendant in this case. He stated that he knew he was going to testify today, but refused to come to the court room. Bardlett denied that he was in a gang and that he was afraid to testify.

¶ 16     Subsequently, Bardlett admitted he was in a gang called the OTAs in January 2014. However, he maintained that he was not afraid to testify. He stated that he did not recall whether he identified defendant as the shooter to the police in February 2014. He acknowledged meeting with Detective Ptak and Assistant State's Attorney Tim Diamond in February 2014, but then denied being able to tell if he was in a video recording of the conversation. Bardlett further acknowledged that he had a deal with the State that required him to provide truthful testimony in this trial and that if he failed to do so, the agreement was void. Bardlett replied "no comment" when asked whether he, defendant, and Davis were members of the OTA gang. He testified that he knew Kionta Williams and Kenneth Williams but said he was not sure if they were in the OTA gang. Bardlett claimed he did not recall whether he was at Sam's Tobacco on January 19, 2014. He professed being unable to remember a number of things, and he denied that he was in several photographs presented to him by the State. Bardlett denied giving his cell phone to Kenneth Williams on January 19, 2014.

¶ 17     On cross-examination, Bardlett testified that he had known defendant for a long time. Defendant had never threatened Bardlett. He had not spoken with defendant, aside from passing small talk, while in jail. Nobody had threatened Bardlett on defendant's behalf. Bardlett identified himself, defendant, and Davis in a photograph in which Davis is wearing an Abercrombie & Fitch shirt. Davis frequently wears Abercrombie & Fitch products. His mother's telephone number was (773) 443-8444. He never loaned her phone to anyone. Bardlett was aware that his testimony would result in his deal with the State becoming void. He stated that the reason he changed his testimony is that he wanted to tell the truth. He knew that he would likely be charged with first-degree murder.

¶ 18    Bardlett identified a written statement he made, dated May 1, 2015, asserting that he initially lied to the police when he told them that Davis drove the vehicle to the attempted robbery. In this statement, he asserted that Davis got out of the vehicle about half a block after they left the BP gas station. He also stated that Davis left his sweatshirt in the vehicle. Bardlett and Davis signed the statement, and it was notarized. Davis had directed Bardlett to write this statement, and it was false. Bardlett also identified a note he attempted to pass to defendant in jail in March 2014. The note states, in pertinent part, "I know you ain't have nothing to do with it," and "This you going be good."

¶ 19    Bardlett identified (312) 709-4776 as Davis's telephone number. Kionta Williams's number was (773) 263-2199. On January 19, 2014, Kenneth Williams and Kionta Williams followed the van that Bardlett purportedly drove to Sam's Tobacco. Bardlett did not recall using Davis's phone on January 19, 2014.

¶ 20    After cross-examination, trial recessed for the night. The next morning, Bardlett refused to come to court and was returned pursuant to a drag order. On redirect-examination, Bardlett agreed that he had testified there were four people in two vehicles that drove to Sam's Tobacco, but he refused to identify them. He denied being able to recall numerous statements he purportedly made to the police. Bardlett was combative with counsel and the trial judge.

¶ 21    Detective Richard Arsenault was the State's next witness (his testimony was taken out of order while Bardlett was being compelled to return to court). Arsenault stated that he is employed by the Naperville Police Department and assigned to the major crimes task force. On February 8, 2014, Arsenault was tasked with finding defendant and Davis. He was also to find a red Abercrombie & Fitch sweatshirt and a pair of True Religion jeans. At about 2:20 p.m., he drove past Davis's house and saw Davis standing outside. He spoke with Davis about the incident at

Sam's Tobacco. Davis was holding a cell phone, texting someone. Subsequently, Arsenault learned that Shakyra Clark was the mother of defendant's child. Arsenault went to her residence, spoke with her, and conducted a search. He observed a brown canvas belt. Later, he learned that the person depicted in the Sam's Tobacco recording was wearing a brown canvas belt. He returned to Clark's residence with a team and executed a search warrant. They seized the belt at that point.

¶ 22 On cross-examination, Arsenault testified that after he first made contact with Davis, they went inside Davis's residence, with his consent. Several individuals came up from the basement, including one known as Z Money. Arsenault and Davis went downstairs. Defendant was not present.

¶ 23 The State next called Tremayne Davis. Davis testified that he was currently being held in the Du Page County Jail. He knew defendant and Bardlett. Davis was testifying pursuant to a deal he made with the State. He was to provide truthful testimony and would be sentenced to eight years' imprisonment for armed robbery in connection with the murder of Hussein Saghir. He had been charged with first-degree murder, which was dismissed as part of the deal. In May 2015, Davis asked Bardlett to write a statement exonerating Davis. Bardlett complied, and the statement was notarized. The statement indicated that Davis was with a woman at the time of the murder, and Davis arranged for two women to lie for him as alibi witnesses.

¶ 24 Davis testified that he was a member of the OTA gang. "OTA" stands for "Off The Avenue." Defendant and Bardlett were also members. At this point, the trial court again read the instruction that it gave at the start of Bardlett's testimony concerning the limited use of evidence of gang affiliation.

¶ 25 On January 19, 2014, around 4 p.m., Davis was at home. He received a telephone call that his cell phone indicated was from Bardlett; however, it was actually from Kenneth Williams. This

was not unusual. Williams asked Davis to come outside, and Davis did. The Williams brothers, defendant, and Bardlett were there. Bardlett had a minivan. After a while, Davis, defendant, and Bardlett got in the van and started riding around. Bardlett, who was wearing a black hooded sweatshirt was driving. Davis was wearing a "[m]aroon Abercrombie hoodie," jeans, and dark shoes. Davis could not recall what defendant was wearing. They went to a BP gas station, where Davis purchased "a couple dollars" worth of gas. The Williams brothers followed in a red car.

¶ 26 Davis testified that the heater in the van did not work properly—it was either "on full blast" or off. When Davis got back into the van after pumping gas, he took his hoodie off an threw it in the back seat. Davis had his cell phone with him. Bardlett had given his cell phone to the Williams brothers. Kionta Williams called on Bardlett's phone to talk to Bardlett.

¶ 27 Bardlett drove to Sam's Tobacco, which was in a strip mall. They parked behind the building. Defendant asked Davis if he could wear his maroon hoodie, and Davis stated that he could. Defendant and Bardlett got out and went to the store. A minute or two later, defendant and Bardlett came running back around the corner of the building. Davis jumped in the driver's seat and drove off. After they got back into the van, defendant said, "I didn't do anything wrong, did I?" Bardlett was sitting in the front passenger seat, and defendant was sitting in the back. Davis observed a revolver on the seat next to defendant. Kionta Williams called Davis's phone, which Bardlett answered.

¶ 28 Davis drove to a currency exchange. Davis was wearing a light green shirt at this time. Bardlett and Davis switched seats. Davis went home. Davis had previously seen the gun, but never saw it again. He also never saw his maroon hoodie after January 19, 2014. Defendant was the last person Davis saw in possession of the hoodie. Davis identified pictures of himself at the

BP gas station wearing the maroon hoodie. He also identified two pictures where the Williams brothers were driving a red car following the van he was in.

¶ 29    On February 8, 2014, a plainclothes police officer came to Davis's residence. The officer asked if Davis had seen a recording of the murder at Sam's Tobacco. The officer asked to go inside, and Davis gave him permission to do so. After the police left, Davis sent a text message to Kionta Williams stating, "Tell Steph to get gone dey slid on me." He explained that "Steph" refers to defendant and "dey slid on me" meant that the police came to see Davis. The police asked if he recognized anyone in the video recording, and he stated that one of the individuals might look like defendant (though he actually knew it was defendant) and that he did not know Bardlett.

¶ 30    Davis testified that he had previously seen the gun that he saw in the backseat next to defendant. A few days before the murder, a photograph of defendant holding the gun was taken by Davis.

¶ 31    On cross-examination, Davis testified that when he first went outside on the afternoon of January 19, 2014, and met his fellow gang members, Bardlett was smoking PCP. This was something Bardlett did regularly. There were a lot of clothes and things in Bardlett's van. He did not know what they were going to do when he got in the van on January 19, 2014. He did not know anyone was armed. Davis stated that he did not ask where they were going. On the trip to Sam's Tobacco, there were three or four calls made between Bardlett and the Williams brothers. When defendant exited the van to walk to the front of Sam's Tobacco, he was wearing Davis's Abercrombie hoodie. When defendant and Bardlett returned to the van, they were running. After defendant got in the van, he received a phone call.

¶ 32    Davis had two contacts for defendant saved in his cell phone. One was for "Kool Kuntry," with a number of (312) 469-4557; the other was for "Fats" and had a number of (312) 316-1964.

Both were nicknames for defendant. Another contact, number (773) 443-8444 and labelled "K Jeezy" was for Bardlett. There was another entry for "Z Money."

¶ 33 Davis stated that he never asked Bardlett or defendant what had transpired at Sam's Tobacco. When he was questioned by Arsenault on February 8, 2014, he still did not know anything about the murder. Despite not knowing anything, he acknowledged, he texted Z Money and told him to hide the gun. He lied to Arsenault when he stated he did not recognize Bardlett in the recording of the murder because he did not want to get involved. He told Arsenault that the shooter looked like defendant, but he also stated that the shooter looked like him. He added, "[I]t looks like an awful lot of people." Davis identified a photograph of himself holding the revolver used in the murder the night before it occurred. The photograph was take in Davis's home. Another photograph depicted Davis wearing the maroon Abercrombie & Fitch hooded sweatshirt. He identified several other similar photographs taken about a year and a half before January 19, 2014. Davis testified that he liked True Religion brand clothing.

¶ 34 Davis stated that he had a room at the house located at 1417 North Lotus Street. The police executed a search warrant there. He kept personal items in the room, including in a dresser. He identified a cotton belt that the police seized during the search. Davis was taken into custody on February 21, 2014. He was interviewed by detectives Dooley and Larson at that time. On February 22, 2014, Davis called Arniko Miller from the Du Page County Jail and "told him to hide the mop." Davis explained that the term "mop" referred to a gun. In May 2015, Davis admitted that he attempted to create a false alibi. Bardlett assisted him in doing so. According to the alibi, Davis parted with defendant and Bardlett shortly after they left the BP station. In February 2016, Davis was offered a deal by the State. All first-degree murder charges against him would be dismissed if Davis pleaded guilty to armed robbery. He was to serve eight years' imprisonment, with day-

for-day credit as well as credit for the approximately two years he had been held in custody prior to trial.

¶ 35    On redirect-examination, Davis explained that when he texted Z Money and told him to hide the gun, he was referring to a gun other than the murder weapon. He also clarified that a "mop" is a gun with a 30-round clip. When he instructed Miller to hide the mop, he was also referencing a gun other than the murder weapon. There were photographs of other guns in Davis's house. When he saw defendant and Bardlett running back to the van, he jumped in the front seat. He believed something was wrong, "maybe somebody got shot and hurt." He explained that he did this out of "instinct," as there is "a lot of danger where [he was] from." Part of his plea agreement with the State is that he testify truthfully.

¶ 36    The State's next witness was Sergeant Brad Swanson of the Bensenville Police Department. On March 17, 2014, he was sitting in a vehicle outside an apartment in Chicago belonging to defendant's mother. He was looking for defendant. Defendant came out of the apartment, and Swanson, along with other officers, took him into custody. Defendant was placed in Swanson's vehicle, in the rear seat in the middle of the vehicle. Swanson was in the front passenger seat. Swanson did not ask defendant anything, and defendant asked what was happening. Swanson told him that a detective would speak with him shortly. A few minutes later, defendant said that he knew that "hanging around with those guys would get him in trouble." Defendant added that he "doesn't do shit like that" and that "[h]e just likes to fuck his hoes and rap." Defendant asked to see his mother. Subsequently, he stated that his mother would be mad at him "for hanging out with those guys" and that "he would never shoot anybody unless it was in self-defense." Defendant told Swanson that he sang in the church choir.

¶ 37    On cross-examination, Swanson agreed that defendant was not free to leave after he was placed in the back of Swanson's vehicle.  Defendant had been handcuffed by this time.

¶ 38    The State then called Deputy Chief Brian Dooley of the Bensenville Police Department. On January 19, 2014, he was a detective sergeant and was involved in the investigation of the murder of Hussein Saghir.  The police department requested assistance from the major crimes task force.  Early in the investigation, the department released some still footage and a small amount of running footage from the video surveillance recording taken at Sam's Tobacco on January 19, 2014.  As a result, they received some information from juveniles who wished to remain anonymous.  Dooley then attempted to locate Bardlett.  Bardlett was taken into custody on February 8, 2014, and interrogated by Dooley and other officers.  Based on information Bardlett provided, they began to search for a silver Chevrolet Venture.  It was located a few weeks later.  It had been sold to new owners.

¶ 39    Based on information obtained from Bardlett, the police obtained phone records from various phones, including phones with the following numbers: (773) 443- 8444 belonging to Debra Scott (Bardlett's mother); (312) 221-6038 with the post office box of James N. Luis of Irvine, California listed as the billing address (Dooley testified that criminals sometimes buy prepaid phones with cash and provide false information as to the ownership of the phone); (312) 259-2292 belonging to Teshia Russell (defendant's mother); and (773) 667-3067 belonging to Shakyra Clark.  They also obtained Facebook records pertaining to defendant.  Defendant's Facebook records shows he listed Clark's number as the number of this "BM," which Dooley explained meant "baby mama."  The police compared the records from defendant's mother's phone, Clark's phone, and the P.O. Box phone (the phone registered to James N. Luis).  In the approximate month preceding January 19, 2014, there were 88 calls and texts from defendant's mother's phone to the

P.O. Box phone; 126 calls and texts from the P.O. Box phone to defendant's mother's phone; 326 calls and texts from Clark's phone to the P.O. Box phone; and 180 calls and texts from the P.O. Box phone to Clark's phone. Clark's phone and defendant's mother's phone had the highest level of call and text traffic with the P.O. Box phone.

¶ 40    Dooley testified regarding three calls or texts. Two calls occurred within 10 minutes prior to the murder and one that occurred minutes after. Also during this period, an incoming text was received by the P.O. Box phone from the Clark phone. The first such call was from the P.O. Box phone to the Scott phone (Bardlett's mother's phone), occurring at about 5:47 p.m. local time. It lasted 27 seconds. The second call was from the Scott phone to the P.O. Box phone at approximately 5:50 p.m. and lasted 35 seconds. Both phones were routed through a cell tower consistent with them being in the general area of Sam's Tobacco, though Dooley explained that a phone's location could not be pinpointed using such information. Both phones were routed through the same cell tower. Dooley testified that video surveillance recordings from a currency exchange across the street from Sam's Tobacco showed a red car following Bardlett's van. Surveillance recordings from a second currency exchange show the van pulling in followed by the red car. The red car pulls alongside the van for about 30 seconds. The two vehicles leave, and the car continues to follow the van.

¶ 41    On cross-examination, Dooley agreed that he had also obtained phone records from a phone he "attributed" to Kionta Williams. He forwarded these records to the State's Attorney's office.

¶ 42    Dr. Steven White testified that he performed an autopsy on Hussein Saghir. White opined that the victim died from a single gunshot wound to the chest. He further opined that the death was a homicide.

¶ 43     The State's final witness was Tim Diamond, Chief of the Criminal Division of the Du Page County State's Attorney's Office. He is a member of the major crimes task force. On February 11, 2014, in the early evening, Diamond met with Bardlett at the Bensenville Police Department. Detective Mike Ptak was also present. At about 7:45 p.m., Bardlett asserted his *Miranda* rights, and the interrogation ceased. Diamond went home, but about 45 minutes later, he received a call indicating that Bardlett had decided to speak with Diamond and Ptak. Diamond returned to the police station. The second round of questioning continued into the early-morning hours of February 12. Officer Dexter Stephens was also present. Diamond identified portions of the interview, which was recorded, and those portions were played for the jury. The recordings indicate that Bardlett stated that defendant was the shooter at Sam's Tobacco. He described the route they took to Sam's Tobacco. He explained how he parked outside Sam's Tobacco. He and defendant walked to the front door. Defendant looked inside and saw that two people were present. Defendant and Bardlett walked away and waited. They approached when two men were leaving the store and told them to get back inside. Defendant drew his gun. There was a little boy in the store. Bardlett struggled with a man near the door. Bardlett thought a car was pulling up, so he ran back to the van. Bardlett did not mention Davis. The trial court admitted the recorded statement as substantive evidence.

¶ 44     According to Diamond, Bardlett was then charged with first-degree murder. Diamond met with Bardlett again during the afternoon of February 12, 2014. Dooley was also present. Bardlett wanted a deal. This meeting was recorded and portions were played for the jury. Diamond said he would not make any promises at this time. Bardlett then told Diamond he had more information. He indicated that there were others involved and named Davis and the Williams brothers. No deal

was made that day. Diamond and Dooley met with Bardlett on February 14, 2014. In the early part of March 2014, an agreement between Bardlett and the State was reached.

¶ 45    Early in the investigation, portions of the video recordings were released to the media in an effort to identify the perpetrators. However, portions showing that there was a young boy in the store were not released, nor were portions showing the victim stepping toward where the shooter was standing. Diamond testified that neither the P.O. Box phone nor Scott's phone were ever recovered.

¶ 46    On cross-examination, Diamond admitted that he was aware that Bardlett first gave an alibi when he was interviewed by Dooley and Ptak. Diamond was aware that Bardlett gave a false alibi for Davis in May 2015. The State's Attorney's Office sent out investigators and determined that the alibi was false. Diamond agreed that this could be considered a violation of the deal between the State and Bardlett, which required Bardlett to remain cooperative. Diamond further believed that the deal could have been revoked on this basis. They chose not to do so and go forward with the prosecution of defendant and put Bardlett on the stand.

¶ 47    The parties stipulated that Ptak would testify that he interviewed Bardlett on February 11, 2014. Bardlett identified two individuals in two still photographs taken from the Sam's Tobacco surveillance video as defendant and himself. He circled both individuals on the photographs and wrote who each was. The person identified as defendant is wearing a red hooded sweatshirt.

¶ 48    The State rested, and defendant moved for a directed finding. Defendant then called Stephanie Russell. Stephanie testified that she is defendant's sister. She stated that she knows Davis, but "[n]ot very well." The same is true of Bardlett, and she does not know Kenneth Williams or Kionta Williams. Stephanie was home on January 19, 2014. She woke up around 11 a.m. During the day, defendant was home, as was her mother and other siblings. Defendant never

left the home, to her knowledge. She never lost sight of him for more than 30 minutes or 45 minutes. Her mother had to work at 6 p.m. Around 5:30, her mother was getting ready for work. Defendant was present and was "kind of sad" as it was "the anniversary of our godbrother being killed." Defendant was playing a video game. Defendant was responsible for watching the younger siblings and feeding them. Defendant was also responsible for watching Stephanie. Stephanie usually would stay up until her mother got home around 3 a.m. Defendant never left.

¶ 49    On cross-examination, Stephanie agreed that defendant was sad about the death of his godbrother for several days around that time. She acknowledged that she did not come forward with this alibi until July 2016.

¶ 50    Defendant next called Teshia Russell, his mother. Teshia testified that she knew Davis, Bardlett, and the Williams brothers. They grew up in the same neighborhood with defendant. On January 19, 2014, defendant was living at home. He had a girlfriend named Shakyra Clark. On January 19, 2014, Teshia awoke about 11 a.m. or noon. All of her children, including defendant, were home. She had to work at 7 p.m. that day. Defendant was home all day. She estimated that she left for work around 5:30 p.m. Defendant was home at that time. As the oldest, defendant was responsible for watching his younger siblings. She returned home between 1:30 a.m. and 2 a.m., and defendant was present. Teshia explained that January 19 is significant to them, as '[s]omeone close to [them] died the day before a year prior."

¶ 51    Teshia testified that in January 2014, defendant did not have a phone. He would use her phone, Clark's phone, or his friends' phones. Defendant would sometimes use Kenneth Williams's phone. Defendant was closest to Kenneth Williams; Teshia was close to his mother. Teshia stated it was "more than likely" that she took her phone to work with her on January 19, 2014. Teshia identified 60 calls and 28 texts on a phone record from her phone to Kenneth

Williams's phone. She explained that this would have been her trying to contact defendant or defendant using her phone. There were also 90 calls and 39 texts from Kenneth Williams's phone to her phone. These would have been Kenneth Williams trying to contact defendant or defendant using Kenneth Williams's phone to contact Teshia. The records also indicated that there was a text from Kenneth Williams's phone to her phone at about 9:45 p.m. on January 19, 2014, and there is no reply. This, Teshia explained, was because she does not respond to texts when she is at work.

¶ 52    On cross-examination, Teshia explained that defendant stayed at his girlfriend's house at times. He kept some clothes there. Defendant spent a lot of time with Kenneth Williams, seeing him "almost every day." Teshia learned that she would be an alibi witness a couple months before the trial.

¶ 53    Defendant then testified. He is 23 years old. Before being taken into custody, he lived with his girlfriend (Clark) and would also stay at this mother's house at times. Defendant stated that he went to school with Bardlett and Davis and that Kenneth Williams is his best friend. Kionta Williams is Kenneth's little brother. Defendant saw Davis wearing the Abercrombie & Fitch hoodie seen in the surveillance recordings a lot. Davis was wearing it in the surveillance recording taken at the BP Station. Kenneth Williams was also seen in this recording. He has a phone in his hand. At the time, Kenneth Williams had his own phone.

¶ 54    He and Kenneth Williams became best friends when they learned that both their mothers had had breast cancer. Defendant liked to play basketball and rap. He made rap videos with his friends, and they put a lot of effort into it. Sometimes they would take photographs. Defendant identified one of the pictures of him holding two weapons, which was admitted during the State's case. It was taken in Davis's basement. The belt the police recovered from Clark's home was not

his. Defendant did not have a phone in January 2014, so he would frequently use the phones of Kenneth Williams, Teshia, and Clark. Records showed a text from Kenneth Williams's phone to Teshia's phone in the evening of January 19, 2014. Defendant was at his mother's house.

¶ 55    On January 19, 2014, defendant awoke at his mother's house. His four siblings were there. He did not recall what time he woke up. He did not leave the house that day. After it got dark, his mother started getting ready for work. Defendant remained at the house because he was responsible for watching his siblings. He frequently takes care of them. Stephanie was 17 years old at this time. He was concerned about boys coming over to see her. His mother returned home around 1 a.m. or 2 a.m. The day before January 19, 2014, was the first anniversary of defendant's godbrother's death. There were three calls between Clark's phone and Kenneth Williams's phone around 11:30 p.m. on January 19, 2014. He stated he had Clark's phone at the time. There were about 20 texts from Clark's phone to Kenneth Williams's phone that day between 2:37 p.m. and 4:44 p.m. There is a two hour gap in texting between the phones, and then a number of texts beginning at 6:48 p.m. continuing until 10:35 p.m. There were a number of texts that day from Kenneth Williams's phone to Clark's phone, with a gap from about 4:30 p.m. to 8:30 p.m.

¶ 56    Defendant was arrested on March 17, 2014, at about 9:15 p.m. He was leaving from his mother's home to go to the store. Defendant stated, "[A] lot of officers jumped out." He could not remember exactly how many, but it was more than six. Defendant was handcuffed and put in the back of a police car. The police asked him about his rapping, and he told them he liked to rap and "have sex with his hoes." He also told them he sang in the church choir, which was true. Defendant acknowledged stating that his mother told him not to hang around with the people he was hanging around with because they would get him in trouble. He also said he would only shoot

a gun in self-defense, but this was because the police were asking about it. He did not know what he was in custody for.

¶ 57    On cross-examination, defendant agreed that he and Davis were friends in January 2014, but not close friends. The same was true of Bardlett. They were all in the OTA gang, as was Kenneth Williams. At this point, the trial court again read the limiting instruction regarding gang-related evidence that it gave at the start of Bardlett's testimony. In January 2014, defendant was involved in no conflicts with Davis or Bardlett. Defendant stated that he did not become upset with Bardlett when Bardlett told the police that defendant was the shooter. When defendant was arrested, he assumed it was for the murder at Sam's Tobacco.

¶ 58    On redirect-examination, defendant testified that he did not shoot anyone on January 19, 2014. He reaffirmed this on recross-examination. Defendant then rested.

¶ 59    The jury found defendant guilty of first-degree murder and attempted armed robbery. It further found that he personally discharged a firearm during the offense, proximately causing the death of Hussein Saghir. Counsel filed a post-trial motion, and defendant filed several more *pro se*. The *pro se* motions included claims of ineffective assistance of counsel. Therefore, the trial court conducted a first-stage *Krankel* hearing. It found one of defendant's claims well founded and advanced the claim to the second stage. That claim concerned trial counsel's failure to present evidence that the victim's brother Ahmad Saghir, who witnessed the crime, failed to identify defendant in a photographic lineup. In addition, the police did not include Davis in a photographic line up for Ahmad to consider. The trial court appointed new counsel to represent defendant in further proceedings. An evidentiary hearing was held on defendant's motion. The trial court rejected defendant's claim of ineffectiveness, finding that counsel's omission did fall below an objective standard of reasonableness but did not prejudice defendant.

¶ 60    Subsequently, a sentencing hearing was held.  Ultimately, the trial court sentenced defendant to 50 years' imprisonment for the murder and an additional 5 years' imprisonment, to be served consecutively, for the attempted armed robbery.  Following denial of a *pro se* motion to reconsider, this appeal ensued.

¶ 61                                    III. ANALYSIS

¶ 62    On appeal, defendant raises five main issues.  First, he argues that trial counsel was ineffective for failing to present potentially exculpatory lineup evidence at trial.  Second, he asserts that the trial court abused its discretion in allowing the State to introduce evidence of gang affiliation where the offenses defendant was charged with were unrelated to gang activities.  Third, defendant contends that counsel was ineffective and the trial court erred in the handling of certain "lay opinion identification testimony" given by a police officer.  Fourth, defendant argues that the cumulative impact of defense counsel's errors constituted ineffective assistance of counsel.  Fifth, defendant claims that his sentence of 50 years' imprisonment is a *de facto* life sentence and that it therefore violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. art. 1, § 11), as he was only 20 years old at the time of the offense.  For the reasons that follow, we affirm.

¶ 63              A. INEFFECTIVE ASSISTANCE: LINEUP EVIDENCE

¶ 64    Defendant first argues that trial counsel was ineffective in failing to present certain exculpatory evidence concerning two photographic lineups the police conducted.  Ahmad Saghir, the victim's brother and a witness to the shooting, moved to Lebanon shortly after the shooting occurred.  Sergeant Brian Dooley contacted Ahmad and sent him, *via* email, two photographic arrays.  The first one included a photograph of Bardlett.  Ahmad identified Bardlett as one of the offenders.  Defendant was in the second lineup.  Ahmad stated that he did not recognize anyone in the second array.  Additionally, defendant points out, Tremayne Davis was in neither lineup.

Defendant observes that identity was a key issue at trial. We note, however, that defendant expressly agreed to proceed in this manner. Before the trial court accepted the stipulation regarding what Ahmad would testify to regarding the foundation for the Sam's Tobacco surveillance recording, it explained to defendant that Ahmad would not be coming to court and would not be cross-examined. The trial court asked, "You are agreeing to proceed in that manner." Defendant replied, "Yes."

¶ 65    Pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), the trial court conducted an inquiry into defendant's *pro se* allegations of ineffective assistance of counsel. The trial court found several of the issues potentially meritorious and appointed outside counsel to assist defendant. The issue of counsel's failure to present the lineup evidence was presented to the trial court during second-stage *Krankel* proceedings.

¶ 66    The trial court found that trial counsel's performance fell below an objective standard of reasonableness, but that this omission did not prejudice defendant. It recounted the evidence against defendant. It noted Davis's testimony and Bardlett's videotaped statement of February 11, 2014, which had been admitted as substantive evidence. The trial court acknowledged that there were credibility issues with both Davis and Bardlett; however, it noted that such matters were presented to the jury. It further noted that their testimony was corroborated by surveillance videos recorded at the BP station prior to the shooting, at Sam's Tobacco during the shooting, and at a currency exchange where they met after the shooting. It noted that there were differences in the clothing of the shooter and Davis in the recordings, specifically the pants and shoes. The trial court pointed to the statements defendant himself made to the police. Moreover, there was circumstantial evidence concerning the gun used in the crime—*i.e.*, a photograph of defendant holding the gun that was taken by Davis. The trial court then ruled that in light of all of this

evidence, the fact that Ahmad was unable to identify defendant in a single line up along with the fact that he was never given an opportunity to identify Davis did not create a reasonable probability that the outcome of the trial would have been different.

¶ 67     When a defendant alleges that trial counsel is ineffective, the familiar standards first articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), control.  To succeed on such a claim, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant. *People v. Manning*, 241 Ill. 2d 319, 341 (2011).  Counsel's performance is to be judged with reference to prevailing professional norms.  *People v. Cherry*, 2016 IL 118728, ¶ 24.  To show prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different.  *Id*.  A "reasonable probability" is one sufficient to undermine confidence in the outcome.  *People v. Spann*, 332 Ill. App. 3d 425, 433 (2002).  An attorney's trial strategy is generally immune from an ineffectiveness claim.  *People v. Walton*, 378 Ill. App. 3d 570, 589 (2007).

¶ 68     Where, as here, the trial court has conducted a *Krankel* hearing and ruled on the merits of defendant's ineffectiveness claim, we will disturb its decision only if it is manifestly erroneous. *People v. Jackson*, 2020 IL 124112, ¶ 98.  Defendant argues for a mixed standard of review— deferential for the trial court's factual findings and *de novo* on the ultimate question of the adequacy of counsel's performance.  However, the cases he cites in support of this position do not involve situations where the trial court conducted a *Krankel* hearing and ruled on the defendant's claim.  See *People v. Harris*, 389 Ill. App. 3d 107, 131 (2009).  Accordingly, we will follow the supreme court's clear pronouncement in *Jackson*, 2020 IL 124112, ¶ 98, and apply the manifestly-

erroneous standard of review. Our supreme court has explained, "Manifest error is error that is clearly evident, plain, and indisputable." *Id*. Since a defendant must satisfy both prongs of the *Strickland* test, if a court is able to resolve the claim adversely to the defendant on one prong, it need not address the other one. *People v. Evans*, 186 Ill. 2d 83, 94 (1999). We turn first to the prejudice prong.

¶ 69    Defendant argues that the evidence of record is such that the failure to present the lineup evidence creates a reasonable probability that the result of the proceedings would be different. He reminds us that prejudice may be found where the prospect of acquittal is " 'significantly less than 50 percent.' " *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008) (quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)). He begins by assailing Bardlett's testimony.

¶ 70    Defendant notes that by the time Bardlett spoke with the police on February 11, 2014, the evidence against him was already significant. Ahmad had identified him by this time. Moreover, a tattoo on his face made him easily identifiable in the surveillance video and his minivan was used to travel to and from Sam's Tobacco. Thus, defendant reasons, "His only hope for leniency was to curry favor with the State by naming someone else as the shooter." While we agree that a desire to work out a deal would have been a powerful motive for Bardlett to cooperate with the State, defendant does not explain how that would have been a motive to name the wrong person as the shooter. The evidence showed that Bardlett, Davis, and defendant were friends and fellow gang members. How this motive would have led Bardlett to identify one friend and associate rather than another is not apparent to us. At trial, Bardlett testified that he had a deal with the State that required him to provide truthful testimony and that if he failed to do so, the agreement was void. Presumably, the statement he made in February 2014 that formed the basis of the deal would have been the testimony he intended to give at trial. Since the deal was dependent upon Bardlett

testifying truthfully and since he was seeking a deal at that time, the same powerful motive that Bardlett had to secure a deal would have further incentivized him to tell the truth, since lying would jeopardize the deal. Indeed, Bardlett's agreement with the State required him to cooperate with the police; misidentifying the shooter would certainly not amount to cooperation, In short, we do not find Bardlett's statement as problematic as defendant asserts.

¶ 71    It is true the Bardlett recanted at trial, causing him to lose the benefit of his deal with the State. Whatever his reason for recantation, be it loyalty to a friend or fear of reprisal, we find his claim that he recanted because he wanted to tell the truth incredible. Quite simply, he did not identify the shooter at trial, he simply said the shooter was not defendant. Had Bardlett had an actual desire to tell the truth, he would have accurately identified the shooter.

¶ 72    Defendant observes that Davis had a strong motive to fabricate a story. Davis made a deal with the State whereby all murder charges against him were dismissed and he was to serve a sentence of 8-years' imprisonment. Moreover, Davis acknowledged that the Abercrombie & Fitch sweatshirt worn by the shooter belonged to him. There was evidence that the murder weapon was in his possession the day prior to the shooting. Moreover, Davis spoke with two people about hiding a gun, though he testified that he was not referring to the gun used in the murder. Davis acknowledged lying to the police in February 2014. We agree that Davis's testimony can be fairly challenged on these bases; however, we note, as the trial court did, that it is not uncorroborated. Not only is it corroborated by Bardlett's statement made in February 2014, surveillance videos corroborated it as well.

¶ 73    Defendant also asserts that Detective Larson gave improper lay opinion testimony about the identity of the shooter depicted in the surveillance video recorded at Sam's Tobacco. We will address this testimony later. Suffice to say for now, the trial court did not reference this opinion

in finding that defendant suffered no prejudice as a result of counsel's failure to present the lineup evidence. Like the trial court, we will not consider it in the context of this argument. As such, it is not relevant here.

¶ 74 We further note that there was significant evidence regarding cell phone usage around the time of the murder. Defendant states that he did not own a cell phone; however, there was evidence from which it could be inferred that defendant was in control of the P.O. Box cell phone. Notably, defendant's girlfriend's phone and defendant's mother's phone had the highest level of call and text traffic with the P.O. Box phone. Two calls, one shortly before the murder and one after, were made between the P.O. Box phone and Bardlett's mother's phone. Both phones were routed through a cell tower in the general vicinity of Sam's Tobacco. This evidence, though not conclusive, provides some additional corroboration for Davis's testimony and Bardlett's statement.

¶ 75 Finally, we note that it is unknown why Ahmad failed to identify defendant in the lineup or whether he would have identified Davis had he been given an opportunity to do so. It is possible that his attention was diverted by something (the child inside the store perhaps) and he simply was not focusing on the shooter. A defendant must show actual prejudice, not mere speculation. *People v. Bew*, 228 Ill. 2d 122, 135-36 (2008). In *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 97, the court found the defendant's claim of prejudice (in the context of an ineffectiveness claim) speculative where the defendant asserted that defense counsel did not appropriately cross examine two witness. The court noted that it was unknown whether the witnesses' testimony lacked an adequate foundation. *Id*. Similarly, in this case, Ahmad may have easily explained his failure to identify defendant in the first lineup. If evidence can be developed that would refute such a possibility, such a claim might be cognizable in a postconviction petition.

¶ 76    In light of the evidence and the standard of review, we cannot hold that the trial court committed manifest error when it concluded that even if the lineup evidence at issue here had been presented, there was not a reasonable probability that a different result would have followed. Accordingly, we affirm its decision on this point.

¶ 77                                 B. GANG EVIDENCE

¶ 78    Defendant next argues that the trial court erred in allowing the admission of evidence of his gang affiliation.  He asserts that "[n]one of the evidence adduced at trial suggested that the murder of Hussein Saghir and attempted armed robbery of Sam's Tobacco had any relation to gang activity."  The trial court allowed the State to introduce evidence that defendant, Bardlett, and Davis were members of the OTA street gang.  Defendant contends:

> "The judge's decision triggered a cascade of errors (some of which are raised separately). From voir dire to closing arguments, gang affiliation loomed large over the trial despite the fact it was tangential to the disputed issue—the identity of the shooter."

He concludes that the prejudicial impact of this evidence substantially outweighed its probative value.  Of course, evidence of gang affiliation may not be admitted where its probative value is substantially outweighed by its unfairly prejudicial effect.  *People v. Johnson*, 208 Ill. 2d 53, 102 (2003).  The decision to admit gang-related evidence is reviewed using the abuse-of-discretion standard.  *Johnson*, 208 Ill. 2d at 102.  Therefore, we will reverse only if no reasonable person could agree with the trial court.  *People v. Kladis*, 403 Ill. App. 3d 99, 105 (2010).

¶ 79    The trial court found evidence of  the relationship between Bardlett, Davis, and defendant to be relevant to the issue of bias.  It noted that Bardlett had been inconsistent in relating what had happened at Sam's Tobacco, sometimes implicating defendant and sometimes not.  The trial court found that the gang affiliation of defendant and the other witnesses was relevant to why Bardlett

changed his version of events. The trial court further ruled that a limiting instruction would be given to the jury indicating that this evidence could only be used on the issue of the bias, interest, or motive of any witness for the testimony the witness gave. In fact, at or near the beginning of each occasion where such evidence was presented to the jury, such an instruction was given.

¶ 80 We find no abuse of discretion in the manner in which the trial court handled this evidence. A reasonable person could conclude that a close relationship between Bardlett and defendant would be a motive for Bardlett to wish to refrain from implicating defendant in a crime. *Chapman v. Hubbard Woods Motors, Inc.*, 351 Ill. App. 3d 99, 105 (2004) ("Even though the subject of Linda's friendship with Mr. Berger was not brought out on direct examination, it would have been proper for the plaintiffs' attorney to question her about it to reveal any bias she would have had in favor of Hubbard Woods Motors."). Indeed, evidence of gang affiliation has been held to be relevant to the issue of bias. *People v. Blue*, 205 Ill. 2d 1, 18 (2001); *People v. Gonzalez*, 104 Ill. 2d 332, 337-38 (1984). In other words, the trial court did not abuse its discretion in finding this evidence relevant.

¶ 81 Defendant argues that the close relationship between Bardlett, Davis, and defendant, which the trial court found relevant to their potential bias, could have been established simply by asking how Davis and Bardlett knew [defendant] and the extent of their relationship." According to defendant, going beyond this into evidence of gang affiliation was unfairly prejudicial, as there was no evidence that the crime for which he was on trial was gang related. See *People v. Roman*, 2013 IL App (1st) 110882, ¶ 30. Our supreme court has held that despite the fact "that, particularly in metropolitan areas, there may be strong prejudice against street gangs," "evidence of gang affiliation need not be excluded if it is otherwise relevant and admissible." *People v. Smith*, 141 Ill. 2d 40, 58 (1990). Thus, the mere fact that some prejudice accrued to defendant is

not enough to exclude such evidence as the trial court determined it was relevant to bias, and, as we explain above, this determination was not an abuse of discretion. Indeed, evidence of gang affiliation has been held to be probative regarding why a witness has changed his or her testimony. *People v. Maldonado*, 398 Ill. App. 3d 401, 419 (2010) ("The State did correctly use the gang evidence in closing arguments to explain why the witnesses changed their stories.");

¶ 82 Moreover, we reject defendant's contention that the trial court abused its discretion because evidence of the relationship between Davis, Bardlett, and defendant could have been presented without referring to their gang affiliation. A reasonable person could conclude that the relationship inherent in gang membership is not the same as the relationship that exists between friends. Moreover, in this case, defendant and the witnesses were both friends and members of the same gang, which would allow an inference of an even closer relationship, so a reasonable person could conclude both were relevant. Moreover, unlike evidence of an amicable relationship, evidence of gang affiliation suggests the possibility of retaliation if Bardlett testified against defendant.

¶ 83 It is true that Bardlett denied that he had been threatened by defendant or anyone else. However, in *People v. Shief*, 2016 IL App (1st) 141022, ¶ 62, the court found such evidence admissible under similar circumstances:

"This court has rejected the notion that, for gang evidence to be admissible to explain a witness's recantation, the State must have evidence of 'an actual decision by the gang to intimidate [the specific] witness or the gang's practice to "always" intimidate testifying witnesses.' As we have explained, 'the witness may have a legitimate fear of gang retaliation, whether or not the State can prove that the gang made an 'actual' decision with respect to this specific witness or the gang failed to retaliate for every witness.' [Citation.]

In this case, the State was not required to elicit testimony from [the witness] that the Gangster Disciples had a practice of retaliating against witnesses or that they had actually threatened him. The State permissibly relied on the notion that [the witness] would be afraid to testify against a fellow gang member regardless of the existence of an actual threat or official retaliation policy."

The same rationale applies here; a reasonable person could conclude it was relevant on this basis as well.

¶ 84    Moreover, any danger of *unfair* prejudice was substantially mitigated when the trial court instructed the jury on three separate occasions as to how it could properly use this evidence—that is, as evidence of bias alone. The jury is presumed to follow the instructions given to it by the trial court. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Where evidence is admitted for a proper purpose and a trial court instructs a jury that it may only be considered for that purpose, "this prevents error." *People v. Miller*, 302 Ill. App. 3d 487, 494-95 (1998). Hence, we must presume that the jury properly considered evidence of gang affiliation only on the issue of bias, as the trial court instructed. Indeed, defendant's repeated assertions that the crime in this case had nothing to do with gang activity is consistent with the trial court limiting the use of this evidence in the manner it did.

¶ 85    Defendant points out that he was willing to stipulate that defendant, Davis, and Bardlett knew each other and were friends. However, it is well established that "as a general matter, it [is] 'unquestionably true' that 'the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.' " *People v. Walker*, 211 Ill. 2d 317, 333 (2004) (quoting *Old Chief v. United States*, 519 U.S. 172, 186 (1997)). While

it is equally true that "the prosecution has no entitlement or right to present evidence that is unfairly prejudicial when equally probative, nonprejudicial evidence is available and will serve the same purpose" (*Id.* at 339), as explained above, a reasonable person could conclude that the gang-affiliation evidence showed a relationship beyond what ordinary friendship would entail.

¶ 86    Defendant also takes issue with the fact that the trial court did not give the limiting instruction at the beginning of two witnesses' testimony (instead giving it after the subject arose) or during *voir dire*.  However, the trial court did give the instruction three times during the trial and again before the jury began deliberations.  In *People v. Heard*, 187 Ill. 2d 36, 61 (1999), our supreme court held a trial court's failure to instruct a jury regarding the limited purpose to which other crimes evidence could be used until the close of trial did not constitute reversible error.  If the single instruction given in *Heard* was sufficient, *a fortiori*, the four given in this case were as well.  We perceive no reason to disregard the presumption that the jury followed its instructions based on the manner in which this instruction was given.  See *People v. Harris*, 288 Ill. App. 3d 587, 605 (1997).

¶ 87    Finally, we note that defendant, in his reply brief, points out the State's lengthy recitation (about two single-spaced pages) of the trial court's reasoning regarding gang evidence.  Defendant asserts that this was apparently included to show that the trial court "thoughtfully considered" this issue.  Defendant counters that the passage shows that the trial court did not properly consider the degree of prejudice this evidence caused defendant.  While the reasoning of a trial court may be persuasive or useful in many circumstances, we ultimately review the trial court's decision rather than its reasoning.  *People v. Nash*, 173 Ill. 2d 423, 432 (1996).  That is, here, we simply must determine whether any reasonable person could agree with the trial court's decision, regardless of the reasoning that produced it.

¶ 88    In sum, a reasonable person could conclude that the evidence of gang affiliation admitted in this case was relevant to the issue of bias.  Such a person could further conclude that the potential for *unfair* prejudice was prevented by the instructions the trial court gave to the jury on the subject. In turn, a reasonable person could find that the risk of *unfair* prejudice did not substantially outweigh this evidence's probative value.  Accordingly, no abuse of discretion occurred.

¶ 89                              C. LAY OPINION ON IDENTITY

¶ 90    Defendant next asserts that the trial court erred by allowing Detective Larson to opine about the identity of the shooter depicted in the surveillance video recorded at Sam's Tobacco. Additionally, he contends that the trial court should have "engaged in the requisite precautionary procedures designed to safeguard a defendant from unfair prejudice."   He also charges that *Krankel* counsel was ineffective for failing to preserve these issues and trial counsel was ineffective for failing to interpose an objection regarding the latter.

¶ 91    Larson testified that he had "seen defendant on a number of occasions."  He later stated that he had spent "[a] few hours" with defendant.  Under questioning by the State, Larson testified that the individual wearing the Abercrombie & Fitch sweatshirt in the surveillance video taken at Sam's Tobacco was defendant and not Davis.  On cross-examination, the following colloquy occurred:

> "Q. Your analysis, your conclusion that that's him in this picture is based on of course the entire video, right?
>
> A. Yes
>
> Q. But it's based on what you can see, which is this little piece of face, is that fair to say?
>
> A. Yes, it is.

Q. And from that little area here, right, that's actually enlarged, this little area here you are reaching the conclusion that Stephan Russell is that person?

A. Yes, I am."

Defendant acknowledges these issues are not properly preserved as neither was included in the posttrial motion filed by *Krankel* counsel, though, we note, trial counsel did object to the admission of this testimony but did not request any procedures be employed to guard against unfair prejudice. Accordingly, as defendant points out, these issues must be reviewed either as plain error or as claims of ineffective assistance of counsel. In either case, we must first determine whether any error occurred at all.

¶ 92    Before turning to the merits of this issue, we note that the State argues, and we agree, that the doctrine of invited error applies here. Pursuant to this doctrine, "a defendant may not request to proceed in one manner and later contend on appeal that the course of action was in error." *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17. Here, Larson, on cross-examination by defense counsel, was asked about a still photograph made from the Sam's Tobacco video, specifically, whether the person holding the gun was wearing the Abercrombie & Fitch sweatshirt. Larson answered affirmatively. Larson was not asked the identity of this individual. Defense counsel then inquired as to whether the person in the recording made at the BP station wearing the Abercrombie & Fitch sweatshirt was Davis. The clear implication of this questioning was that Davis, who was wearing the Abercrombie & Fitch sweatshirt in the BP station video was the person holding the gun in the Sam's Tobacco video. This inference was possible due to Larson's identification of Davis in the BP station video. By acquiescing in the relevance of Larson's opinions on identification, defense counsel invited the State to explore the subject further. As

such, defendant cannot now complain that the State was permitted to do so. Moreover, this forfeits plain error review. *Id.*

¶ 93 Defendant asserts, in his reply brief, that the invited-error doctrine does not apply to claims of ineffective assistance of counsel. See *People v. Villareal*, 198 Ill. App. 3d 209, 228 (2001). Defendant's initial argument was that the trial court erred by permitting Larson's lay opinion testimony. It was not an ineffectiveness claim. Accordingly, it is outside of the scope of the exception defendant seeks to invoke. However, defendant frames the second argument concerning the failure to employ the proper precautionary procedures, alternatively, as an ineffectiveness argument. In any event, as we explain below, such a claim fails for want of prejudice.

¶ 94 Forfeiture notwithstanding, we will address the question of whether this testimony should have been permitted. We review this issue for an abuse of discretion. *People v. Thompson*, 2016 IL 118667, ¶ 53. Defendant suggests the *de novo* standard should apply, citing *People v. Sykes*, 2012 IL App (4th) 11110, ¶ 30, where the court held, "[W]hether it was proper for the State's witness to narrate the contents of a video when he had no personal knowledge of the events portrayed on the video is a legal issue which does not require an exercise of discretion, fact finding, or evaluation of credibility." We find *Sykes* to be of little guidance here; Larson did not simply describe what was transpiring (*i.e.*, narrate), he opined as to the identity of the individual in the video. Whether to allow such an opinion is a matter committed to the trial court's discretion. Hence, we will apply the standard of review set forth in *Thompson*. Therefore, we will reverse only if no reasonable person could agree with the trial court. *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997); see also *People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 65 ("A trial court's decision to admit lay opinion identification testimony is reviewed for an abuse of discretion.").

¶ 95    Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) governs the admissibility of opinion testimony given by lay witnesses.  Ill. R. Evid. 701 (eff. Jan. 1, 2011).  It provides as follows:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id*.

Our supreme court addressed this rule in the context of a police officer giving lay opinion identification testimony in *Thompson*, 2016 IL 118667.

¶ 96    In that case, the court reiterated the requirements of Rule 701: "[W]e now hold that opinion identification testimony is admissible under Rule of Evidence 701 if (a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *Thompson*, 2016 IL 118667, ¶ 50. It then expanded upon when such testimony would be "helpful" within the meaning of the rule, "Lay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Id*. It clarified, "A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required." *Id*. It further explained, "[T]he witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Id*. Whether to admit such an opinion is to be assessed with regard to the totality of the circumstances. *Id.* ¶ 51.

¶ 97    Defendant does not challenge the first prong of Rule 701—that the testimony was rationally based on Larson's observations.  Rather, he argues that the trial court erred in concluding that it

was helpful. He asserts that "no basis existed to conclude Larson was uniquely positioned to identify the shooter." He points out that Larson had no personal knowledge of the crime. Moreover, Larson never testified to the details of his prior interactions with defendant, simply testifying that he had "seen defendant on a number of occasions" and had spent "[a] few hours" with him. Defendant argues that pursuant to *Thompson*, this simply is not enough familiarity to establish that Larson's opinion would be helpful to the jury. However, the witness (Sandusky) who gave similar testimony in *Thompson*, 2016 IL 118667, ¶ 72, did not have extensive familiarity with the defendant in that case:

> "There is no evidence Sandusky was generally familiar with defendant. However, we find that Sandusky gained a familiarity with defendant a short time after the recording was made based on his interview with defendant. While the interview may have been short, Sandusky interacted with defendant in a more natural setting and this interaction gave him a perspective the jury would not acquire in its limited exposure to defendant in the courtroom. Thus, there is some basis to conclude Sandusky was more likely to correctly identify defendant than the jury."

While Larson did not explain the details of his interactions with defendant, seeing defendant on "a number of occasions" and spending a "few hours" with him would compare favorably to the witness in *Thompson*, who only saw that defendant during a short interview. Surely, this gave Larson a perspective that the jury did not have based on its limited exposure to defendant during the trial. At the very least a reasonable person could come to these conclusions, and, as the abuse of discretion standard applies here, we are compelled to reject defendant's argument on this issue.

¶ 98    Defendant asserts that the jury was capable of drawing its own conclusions about the recording. He cites *People v. Latimer*, 403 Ill. App. 3d 595, 599 (2010), for the proposition that

the "trier of fact is 'perfectly capable' of comparing images and the testifying police officer did not have 'any special expertise in comparing images' for identification purposes." *Latimer* is distinguishable in that here, it was not an abuse of discretion for the trial court to conclude, in accordance with *Thompson*, that Larson's contact with defendant provided him with a basis to render an opinion that would be helpful to the jury, unlike the witness in *Latimer* who lacked "special expertise." *Sykes*, 2012 IL App (4th) 11110, ¶ 42, upon which defendant also relies is distinguishable on a similar basis: "[The witness] was in no better position, based on the video admitted into evidence and published to the jury, to determine whether defendant removed money from the register, and, thus, his opinion testimony invaded the province of the jury."

¶ 99    Having concluded that the trial court did not err in admitting this evidence, no plain error occurred (*People v. Smith*, 372 Ill. App. 3d 179, 181 (2007)) and counsels' failure to preserve this issue cannot amount to ineffective assistance (*People v. Peeples*, 205 Ill. 2d 480, 514 (2002)).

¶ 100    Defendant also complains that no protective procedures were employed before this opinion was permitted into evidence. In *Thompson*, 2016 IL 118667, ¶ 59, the supreme court held as follows:

"We hold, therefore, that when the State seeks to introduce lay opinion identification testimony from a law enforcement officer, the circuit court should afford the defendant an opportunity to examine the officer outside the presence of the jury. This will provide the defendant with an opportunity to explore the level of the witness's familiarity as well as any bias or prejudice. Moreover, it will allow the circuit court to render a more informed decision as to whether the probative value of the testimony is substantially outweighed by the danger of unfair prejudice. Although a witness may identify himself as a law enforcement officer, his testimony involving his acquaintance with the defendant should

consist only of how long he knew the defendant and how frequently he saw him or her. Moreover, to lessen any concerns regarding invading the province of the jury or usurping its function, the circuit court should properly instruct the jury, before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed."

The State questions the applicability of these safeguards in the current context. That is, it asserts it did not really "seek to elicit that testimony in the first instance." Rather, the State simply responded after defendant introduced the issue in his examination of Larson. While this may have rendered it impossible to allow defendant an opportunity to examine Larson outside the presence of the jury (and, of course, defendant chose to pursue this course without such an opportunity), it would have still been possible to instruct the jury as contemplated in *Thompson*, if not before Larson testified, at least belatedly. Thus, we will assume that this was error.

¶ 101 We fail to see how this omission resulted in substantial prejudice to defendant. First, we note that while the jury was not given the instructions set forth in *Thompson*, it was properly instructed that:

"Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

Instructing the jury that it need not credit Larson's lay opinion or that it must not draw an inference from the fact that Larson is a law enforcement officer would provide only incrementally greater

protection. In his reply, defendant points out that the *Thompson* court found that such an additional instruction was necessary despite indications that the jury in that case had been instructed similarly to the jury in this case (see *Thompson*, 2016 IL 118667, ¶ 29). We agree that this would not cure the error at issue; however, it is certainly relevant to the amount of prejudice defendant suffered. Moreover, we note that Larson was effectively cross-examined by defense counsel regarding his opinion. Defense counsel got Larson to admit that his identification was based on "this little piece of face" that appears in the recording. In light of these two considerations, it is clear that any actual unfair prejudice accruing to defendant was minimal.

¶ 102   Given that defendant suffered only minimal prejudice at most, defendant's assertions that it amounts to plain error or ineffective assistance of counsel must fail. Regarding the latter, there is no reasonable probability that the trial would have come to a different result (*Cherry*, 2016 IL 118728, ¶ 24) had the jury received the additional instructions required by *Thompson*. To succeed on a plain-error argument, defendant would have to show either that the evidence was closely balanced, without regard to its seriousness or that the error is serious, regardless of the evidence being closely balanced. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Given the limited prejudice accruing to defendant, this was not a serious error.

¶ 103   Defendant, however, contends that the evidence was closely balanced. We disagree. In assessing whether evidence is closely balanced, " a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53 (citing *People v. Belknap*, 2014 IL 117094, ¶¶ 52-53). For example, evidence is closely balanced "when witnesses for the State and witnesses for the defense [give] plausible opposing versions of the events, neither of which was corroborated by extrinsic evidence." *People v. Olla*, 2018 IL App (2d) 169118, ¶ 34 (citing *People v. Daniel*, 2018

IL App (2d) 160018, ¶ 31). Further, where one side's version of events is corroborated and the other's is not, the evidence is not closely balanced. *Olla*, 2018 IL App (2d) 169118, ¶ 38. Similarly, the fact that a witness has no motivation to lie adds weight to that witness's testimony. *Id.* ¶ 39. A review of the evidence in this case indicates that it is not closely balanced.

¶ 104 As noted previously, though there were issues with both Davis and Bardlett, their testimony was largely consistent and corroborated by other evidence, particularly the video recordings, but also the cell phone tracking data and defendant's statements to the police at the time he was arrested. The cell-phone evidence also undermines defendant's purported alibi, which was provided by his sister and, to an extent, his mother. We note that like the testimony of Bardlett and Davis, the testimony of defendant's mother and sister can be questioned as well, in their case, due to their close familial relationship. See *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1038-39 (2011) ("As such, both attorneys agreed that the best defense was to focus on the weakness of the State's case and to avoid offering a weak alibi. Moreover, because of [the witness's] relationship with the defendant, she likely would not have been considered credible."); *People v. Deloney*, 341 Ill. App. 3d 621, 635 (2003) ("[W]e note that the alibi witnesses were defendant's cousins and, as such, their credibility may have carried little weight."). Conversely, as explained above, Bardlett—though he may have had a motive to cooperate with the state—had no apparent motive to identify the wrong person as the shooter. In short, while the evidence against defendant may not have been overwhelming, it cannot fairly be characterized as closely balanced.

¶ 105 Therefore, we find defendant's arguments concerning the admission of Larson's lay opinion unpersuasive.

¶ 106 D. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 107   Defendant contends that his counsel was ineffective due to the cumulative effect of a number of additional errors.  First, he contends counsel was ineffective for failing to strike a juror who stated a prejudice against gangs and rap music.  Second, he faults trial counsel for stipulating to the admission of the Sam's Tobacco surveillance video without investigating Ahmad Saghir, who defendant asserts is the only person who could provide a foundation.  Third, he complains of his attorney's failure to object to several purported instances of prosecutorial misconduct.  He also argues that *Krankel* counsel was ineffective for failing to preserve these issues.  We will address these arguments *seriatim*.

¶ 108   The standards governing an ineffectiveness claim are set forth above.  *Supra* ¶ 67.  Also pertinent here, in assessing prejudice, multiple instances of ineffectiveness may be considered cumulatively.  *People v. Bell*, 152 Ill. App. 3d 107, 1019 (1987).  Claims of ineffectiveness not raised in the trial court are subject to *de novo* review.  *People v. Bates*, 2018 IL App (4th) 160255, ¶ 46; *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.  Of course, any factual determinations made by the trial court relevant to such a claim are entitled to the deferential application of the manifest-weight standard.  *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006).  With these standards in mind, we now turn to defendant's arguments.

¶ 109                              1. Failure to Strike a Juror

¶ 110   Defendant first asserts that the trial court was ineffective for failing to strike juror No. 250.  Defendant states, "During voir dire, [trial counsel] failed to object to a juror who bluntly admitted that his prejudices could impact his decision making."  Juror 250 stated that he was a labor law attorney.  He stated that he watches Fox news and disapproves of rap music.  When asked how he would be affected if evidence about rap music was presented, the prospective juror replied: "I'll follow the instructions the judge gives.  But if you're asking how I would perceive the witness,

he's a member of a gang. He's, you know, portrayed in a certain way or lives his life in a certain way. I would have to take that into consideration." He agreed that this would only be a factor if such evidence were presented. He later stated that if a witness were a gang-member, he "would question that person in a way [he] wouldn't question another person."

¶ 111   However, during questioning by the trial court, he affirmed that he could be fair to both sides and "render a decision that's free from any sympathy, bias, or prejudice of any kind." He further agreed that he could "keep an open mind and wait until [he had] heard all the evidence before [he would] reach a decision in this case." He also affirmed that any decision he would make would "only come from the evidence that [he heard] inside this courtroom." He added, "I would make a decision based on the evidence." When asked whether he could give a gang-member a fair trial, he stated, "I think I could give him a fair trial, I do." He replied negatively when asked whether he had any hesitation that he could provide defendant with a fair trial. Juror No. 250 stated that he would judge a person's character based on their listening to rap music.

¶ 112   As noted, matters of trial strategy generally will not support a claim of ineffective assistance. *Walton*, 378 Ill. App. 3d at 589. This court has previously held, "In general, counsel's actions during jury selection are considered a matter of trial strategy, and counsel's strategic choices are virtually unchallengeable." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 71. Only where an attorney's strategy is so unsound that "no reasonably effective defense attorney, confronted with the circumstances of the defendant's trial, would engage in similar conduct" can it support an ineffectiveness claim. *People v. Watson*, 2012 IL App (2d) 091328, ¶ 24. We do not believe that this is the case here.

¶ 113   It is true that Juror No. 250 expressed a strong bias against rap music and gangs. However, he also repeatedly reaffirmed that he could decide the case on the evidence and give defendant a

fair trial. Moreover, defense counsel could have concluded that as an attorney, in fact, a litigator, Juror No. 250 would be more able to understand and follow his role in the trial than a lay person would.

¶ 114   In sum, we cannot say that defense counsel's chosen course here was so unreasonable as to remove it from the realm of trial strategy.

¶ 115         2. Stipulating to the Admissibility of the Sam's Tobacco Recordings

¶ 116   Defendant next contends that trial counsel was ineffective because he stipulated to the foundation of the Sam's Tobacco surveillance recording. Whether to enter into a stipulation is generally a matter of trial strategy. *People v. Morris*, 2014 IL App (1st) 130512, ¶ 40. Essentially, he stipulated that Ahmad Saghir would provide an adequate foundation for the recording. Trial counsel understood this to mean that, as a result, the State would not be calling Ahmad as a witness and "that he would not be in court to testify to any other aspects of the case." Trial counsel then explained the basis for his decision to enter into the stipulation:

"I actually thought it was a boon. And the reason is that I did not want Mr. Saghir to appear in court before the jury. There were a myriad of reasons for that, but, primarily, this is a murder case. And these folks are going to hear about a man being shot in cold blood by someone. And I did not want the decedent's brother to be in court, number one, to arouse the passions of the jury. I didn't see how he could add anything to our case at that point. It would only do harm."

Defendant asserts that trial counsel had no basis for these beliefs because he conducted no investigation of Ahmad or otherwise contacted him. However, trial counsel's inferences were reasonable based on the facts that Ahmad was Hussein's brother and also was a witness to an act of extreme violence. Whether to keep such a witness away from the trial appears to us to fall

squarely within the scope of trial strategy. *Cf. People v. Enis*, 194 Ill. 2d 361. 378 (2000) ("Guiding our review of defendant's claim is the principle that decisions concerning whether to call certain witnesses on a defendant's behalf are matters of trial strategy, reserved to the discretion of trial counsel.").

¶ 117 Moreover, defendant's naked assertion that Ahmad was the only person who could have established a foundation for this evidence is insufficient to establish prejudice. As the State points out:

> "Several police officers and first responders appear on the video footage from both inside and outside Sam's Tobacco following the shooting. Testimony from those officers establishing that the videos truly and accurately depicted the events once they arrived on scene, along with testimony regarding the retrieval of the video footage from the store's surveillance system, the integrity of the videos, and the timestamps which are apparent on the video footage that run continuously before, during, and after officers arrived on scene would have, for example, established a sufficient foundation for admission of the video footage."

Defendant replies that the officers and first responders could not have authenticated the portions of the recording during which the shooting took place.

¶ 118 However, it is possible that the State could have established a foundation for the recording using a silent-witness theory. In *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 46, the court explained, "Under the silent witness theory, a surveillance video may be admissible as substantive evidence in the absence of authentication by an eyewitness with personal knowledge of the content if there is adequate proof of the reliability of the process that produced the recording." It continued, "Under this theory, it is not necessary for a witness to testify to the accuracy of the images depicted

in the video so long as the accuracy of the process used to produce the evidence is established with an accurate foundation." In *People v. Taylor*, 2011 IL 110067, ¶ 35, the supreme court set forth the following non-exclusive list of factors to consider in determining whether to allow the admission of such evidence: "(1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6) explanation of any copying or duplication process."

¶ 119    Defendant counters, "The State asserts that the testimony about the retrieval of the video footage could have been used to establish the foundation, but there was no such testimony here." He adds, "Whether the officers [who retrieved the recording] could have testified about the actual retrieval process is unknown." Defendant acknowledges, "[P]erhaps some other employee of Sam's Tobacco, could have testified about the accuracy and reliability of the recording system." The reason, of course, that there was no evidence concerning the reliability of the recording system is that defendant stipulated to the admission of the recording. Had defendant not entered into the stipulation, it is possible that the State could have established a foundation for the recording through testimony of witnesses at the scene, the silent-witness theory, or a combination of both. It is also possible that they could have secured the testimony of Ahmad. In any event, allowing defendant to succeed here by assuming the State could not present evidence that defendant agreed it was not required to present would amount to allowing defendant to show prejudice by mere speculation. That is, defendant's assertion that such evidence could not be produced is conjecture. A defendant may not establish prejudice by speculation. *Bew*, 228 Ill. 2d at 135-36.

¶ 120    This claim fails both because counsel's decision to enter into the stipulation was a matter of trial strategy and defendant failed to show prejudice.

¶ 121                                    3. Prosecutorial Misconduct

¶ 122   Defendant next contends that trial counsel was ineffective in failing to object to multiple instances of alleged prosecutorial misconduct.  Defendant identifies four categories of misconduct: (1) arguing facts not in evidence; (2) misrepresenting evidence; (3) vouching for witnesses; and (4) inserting personal opinion.  It is well-established that the State is entitled to wide latitude in closing argument.  *People v. Smith*, 2017 IL App (1st) 143728, ¶ 75.  There are, however, boundaries that the State may not cross.  See *People v. Glasper*, 234 Ill. 2d 173, 204 (2009); *Smith*, 2017 IL App (1st) 143728, ¶ 75.  For example, a prosecutor "may not argue assumptions or facts not contained in the record."  *Glasper*, 234 Ill. 2d at 204.  Further, "A prosecutor may comment on, but may not enhance, the credibility of the State witnesses."  *People v. Montgomery*, 254 Ill. App. 3d 782, 794 (1993).  It is also improper for the State to interject a personal opinion "unless he states, or it is apparent, that the opinion is based solely on the evidence."  *People v. Dail*, 139 Ill. App. 3d 941, 944 (1985).  However, "Even if a prosecutor's closing remarks are improper, they do not constitute reversible error unless they result in substantial prejudice to the defendant such that absent those remarks the verdict would have been different."  *People v. Hudson*, 157 Ill. 2d 401, 441 (1993).  That is, they must be a material factor in the conviction.  *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 48.

¶ 123   We note a split in authority regarding whether the abuse-of-discretion standard of review or the *de novo* standard of review applies.  *People v. Burman*, 2013 IL App (2d) 110807, ¶ 26.  This court has previously held that where "we would reach the same result under either standard in this case, we [will] refrain from discussing the applicable standard until our supreme court resolves the conflict."  *Id*.  Such is the case here.

¶ 124    We first address defendant's assertion that the State argued facts not in evidence. Defendant correctly points out that "[s]uch argument constitutes unsworn testimony by a witness who is not subject to cross-examination, and it is not compatible with a fair criminal justice system." *People v. Watson*, 94 Ill. App. 3d 550, 557 (1981). Defendant first complains of the State making reference, on five occasions, to there being gang members in the court room audience as an explanation for Bardlett's change in testimony. The State also made such a claim in an attempt to bolster Davis's credibility. The trial court instructed the State to desist from such claims and instructed the jury as follows:

> "Ladies and gentlemen of the jury, there is no evidence in the record that any of Tremayne
>
> Davis's or Kenneth Bardlett's friends were in the audience during the course of this trial,
>
> so please disregard that—those lines of argument."

Generally, such an instruction will cure any unfair prejudice. *People v. Wheatley*, 183 Ill. App. 3d 590, 603 (1989). Moreover, the inference defendant finds problematic, that Bardlett changed his testimony due to fear of reprisal from his gang, was expressly found relevant by the trial court. The trial court ruled that Bardlett's membership in the OTA gang was relevant to his potential bias (that is, the most damaging inference was deemed relevant). Any additional prejudice from the State implying that gang members were actually present at the trial would have been incremental, and, again, cured by the trial court's instruction. Nevertheless, we caution the State against engaging in such argument in the future.

¶ 125    Defendant next charges that the State mischaracterized the evidence when it argued that defendant's statement to the police upon being arrested that "I knew hanging out with those guys would get me into trouble" was, in fact, a confession. Mischaracterizing evidence would be improper. *People v. Amaya*, 255 Ill. App. 3d 967, 974 (1994). Defendant asserts that a confession

is "a voluntary acknowledgement of guilt during a judicial proceeding." *People v. Watson*, 2012 IL App (2d) 091328, ¶ 36. Obviously, when defendant was first arrested, a judicial proceeding was not transpiring. Clearly, the State was using the term "confession" in a more colloquial sense. In ordinary parlance, the term means, *inter alia*, "a statement of guilt or obligation in a matter pertaining to oneself." Webster's Third New International Dictionary 475 (2002). The State's assertion that defendant's statement to the police amounted to a confession in the ordinary sense of the word is a fair inference drawn from the evidence. *Cf. People v. Smith*, 154 Ill. App. 3d 837, 849 (1987) ("It is clear from the record that the prosecutor based his characterization on the facts surrounding defendant's allegedly exculpatory statement. The prosecutor was arguing to the jury that the statement was a confession of sorts, a subconscious confession. He was not restating the evidence, but applying the label of a confession as an inference to be drawn from the manner in which the statement was made."). The State argued the inference was valid; it was for the jury to determine whether it in fact was. In short, we perceive no mischaracterization of the evidence here.

¶ 126 Defendant further contends that the State impermissibly vouched for the credibility of certain witnesses. First, he complains that the State, on three occasions, told the jury that the police knew what they are doing. While this may have been technically improper (see, *e.g.*, *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 24 ("A prosecutor may express an opinion based on the record, and may draw reasonable inferences from the evidence presented; however, a prosecutor may not vouch for the credibility of a government witness or use the credibility of the State's Attorney's office to bolster a witness's testimony.")), defendant makes no real attempt to establish that trial counsel's failure to object to it was such a deviation from standards of reasonable professional conduct as to constitute ineffective assistance. Attorneys sometime refrain from

interposing an objection for fear of highlighting something to the jury. In *People v. Wright*, 2013 IL App (1st) 103232, ¶ 76, the court held:

> "We find that defendant's trial counsel did not object as part of his trial strategy. Sergeant Tate's testimony about his conversation with Andrews did not mention defendant. Defense counsel may not have wanted to call attention to the testimony about the prior shooting when none of the State witnesses had placed defendant at the location at the time."

Here, defendant does not explain why "no reasonably effective defense attorney, confronted with the circumstances of the defendant's trial, would engage in similar conduct." *Watson*, 2012 IL App (2d) 091328, ¶ 24. As such, he has not rebutted the presumption that this was trial strategy and incapable of supporting an ineffectiveness claim. See *People v. Giles*, 209 Ill. App. 3d 265, 269 (1991) ("[A] defendant must also overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances.").

¶ 127   The same can be said regarding the next point raised by defendant. Defendant asserts that trial counsel should have objected when the State implied that the trial judge had approved of the plea deal Davis entered into with the State. The trial judge recognized that this could imply that the judge had already determined that Davis was not the shooter. The judge offered to instruct the jury that his approval of the agreement did "not indicate any opinion as to the facts produced at this trial or what your verdict should be." Defense counsel declined, stating, "I do see what you're saying, and then the other part of me says it just draws attention to it." Defense counsel added, "So unless Your Honor has a specific preference based on the law, I would like to leave it as is." Clearly, this was a reasoned decision made by defense counsel after weighing the risks of instructing the jury against the danger of highlighting the issue. As above, defendant makes no attempt to establish that this decision was so outside the bounds of professional conduct that "no

reasonably effective defense attorney, confronted with the circumstances of the defendant's trial, would engage in similar conduct." (*Watson*, 2012 IL App (2d) 091328, ¶ 24). Hence, this argument must fail.

¶ 128 Finally, we address defendant's claim that the prosecutor impermissibly interjected his personal opinions into his closing argument. It is axiomatic that this would be improper. *Dail*, 139 Ill. App. 3d at 944. An opinion based solely on the evidence, however, is permissible. *Id*. Moreover, "The prosecutor's statement should not be taken out of context but should be read in its entirety to determine whether it is a statement of personal belief or is based on the evidence presented at trial." *Id*. Further, the use of terms like "I" or "we" is not *per se* error (*People v. Baker*, 195 Ill. App. 3d 785, 788 (1997) (*overruled on other grounds by People v. Love*, 177 Ill. 2d 550, 560 (1997)).

¶ 129 Defendant sets forth several long block quotations of argument by the State and asserts that the argument was improper, without identifying the precise matter he relies on here. This complicates our review, as portions of the quoted material are plainly proper. For example, defendant sets forth the following:

"Now, with respect to the deal – and, again, you know what I think? [Defense counsel] brought up in the beginning that it's all about the deal, and I think he said it was a net loss, this is the deal with Bardlett that it's a net loss, well, no way, it couldn't be further from the truth. You know, when we put witnesses on the stand we expect them to tell the truth, but when you're dealing with a gang member of the defendant, you've got to expect that they're going to pull the garbage that Bardlett did, and that's exactly what he did do. Do you think it was just happenstance that we had all those video clips at the ready to impeach

this guy? Not just because he's a liar when he got on the stand and did all that nonsense, but that's substantive evidence."

Here, the State's use of "I think" is followed by comments based on evidence, so it is not an attempt to interject a personal opinion. Much of the rest is fair comment on the evidence. The State could legitimately argue the Bardlett's testimony in court was not truthful. *People v. Hudson*, 157 Ill. 2d 401, 444 (1993) ("Moreover, challenging the credibility of a defendant and his theory of defense is proper in closing argument when there is evidence justifying the challenge."). Most problematic, perhaps, is the statement to the effect that "we expect witnesses to tell the truth" but "we also expect gang members to lie." This can be interpreted as the State invoking its experience in dealing with gang members and telling the jury that they lack credibility based on its past experiences. Such argument has been held improper. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 13 ("[I]t would be problematic if the Government 'vouched' for [the witness] by putting the state's stamp of approval on his testimony, or by putting the credibility of the State's Attorney's office behind his testimony."). However, as above, defendant makes no real attempt to establish that failing to object here fell below a reasonable level of professional conduct. Moreover, isolated comments such as this cannot carry defendant's burden of establishing substantial prejudice. See *People v. Davis*, 97 Ill. 2d 1, 25 (1983).

¶ 130   The second passage is as follows:

"We started talking about what's going to happen with that deal. You know what, I'm not a State's Attorney, I don't get to make that final decision, but I can all but guarantee you that the deal is done and Bardlett is going to be facing first-degree murder charges and he's going to be sitting in that chair soon enough. So what if we get – we get all the evidence – the substantive evidence, the truth of what Bardlett was saying back a couple years ago

to absolutely show that he is the murderer, we get that substantive evidence and we get

Bardlett as a murderer, that's called checkmate to the OTA."

It is unclear to us what defendant believes is objectionable in this passage. Defendant has expressly argued that the fact that Bardlett changed his testimony despite the fact that it exposed him to substantial criminal liability enhanced his credibility. Hence, even if this were improper, we fail to see how it is prejudicial.

¶ 131 The third such passage identified by defendant is this one:

"Well, there was something interesting Davis said. He said, you know what, I saw him running around. I got into the driver's seat by instinct. What do you mean by instinct? And I think he tried to explain, but I think that instinct that Tremayne Davis has is a lot different than maybe a lot of people in this courtroom, and that is because it is a different world. He does grow up in a different neighborhood. There are different things that go on in his neighborhood that don't happen here in Wheaton for instance, all right. So when he says he's got instinct on it, that instinct is I don't want to know what happened. I think you know what I mean."

Davis did, in fact, testify, that he got in the driver's seat out of "instinct," as there is "a lot of danger where [he was] from." Thus, that portion of the prosecutor's argument was based on the evidence (the same can be said of the State's comment regarding having "broke" Davis's alibi). The final intimation, "I think you know what I mean," if improper, clearly did not result in substantial prejudice. *Davis*, 97 Ill. 2d at 25.

¶ 132 In short, most of defendant's assertions that the State interjected personal opinion into the trial are unfounded and, to the extent they were not, they did not result in substantial prejudice to defendant.

2021 IL App (2d) 180874-U

¶ 133   Defendant's final contention is that trial counsel's many failings, cumulatively, resulted in sufficient prejudice to support a claim of ineffectiveness.  Of course, in determining whether a defendant was prejudiced, multiple instances of ineffectiveness may be considered cumulatively. *Bell*, 152 Ill. App. 3d at 1019.  We reiterate here, despite defendant's insistence to the contrary, the evidence in this case was not closely balanced.  To assess the sum total of prejudice accruing to defendant, we must review the many instances of asserted ineffective assistance.

¶ 134   First, defendant argued that he was prejudiced by trial counsel's failure to present evidence that Ahmad failed to identify defendant in a photographic lineup and that he was never given an opportunity to identify Davis.  We noted the trial court's finding (which we found not to be manifestly erroneous) that in light of all of this evidence, the fact that Ahmad was unable to identify defendant in a single line up along with the fact that he was never given an opportunity to identify Davis did not create a reasonable probability that the outcome of the trial would have been different.  Further, we noted that whether any prejudice actually accrued to defendant was speculative, as it was unknown why Ahmad failed to identify defendant or whether he would have been unable to identify Davis.  Hence, we cannot conclude that defendant suffered substantial prejudice as a result of this purported error.  Defendant's second argument did not implicate trial counsel's performance.

¶ 135   Defendant's third argument included a claim that trial counsel was ineffective for failing to object to the lack of protective procedures required by *Thompson*, 2016 IL 118667, ¶ 59, when Larson was permitted to offer a lay opinion on the identification of the shooter in the Sam's Tobacco recording.  We concluded that this resulted in minimal unfair prejudice to defendant given how the jury was instructed and the fact that defendant effectively cross-examined Larson on this issue.

¶ 136   We found the trial court's instruction regarding the State's assertion that gang members were present in the court room sufficient to substantially mitigate any potential unfair prejudice. We rejected defendant's claim that the State mischaracterized evidence. We found that defendant failed to rebut the presumption that trial counsel's failure to object to the State vouching for a witness and the trial court sanctioning Davis's plea deal constituted trial strategy. We observed that several of defendant's complaints that the prosecutor interjected his personal opinion during closing argument were ill founded, and to the extent they were well founded, they did not result in substantial prejudice.

¶ 137   Thus, we held that defendant's first argument involved a speculative claim of error and the balance either did not constitute ineffective assistance of counsel or resulted in only minimal prejudice. Therefore, even considered cumulatively, we cannot say that defendant suffered prejudice sufficient to render trial counsel's performance constitutionally deficient.

¶ 138                              E. *DE FACTO* LIFE SENTENCE

¶ 139   Defendant's final argument is that his 50-year prison sentence violates the proportionate penalties clause of the Illinois Constitution (see Ill. Const. art. 1, § 11). He asserts that as he was 20 years old at the time he murdered Hussein Saghir, his brain was not yet fully developed and the case should be remanded for a new sentencing hearing to ascertain whether he "is among the rare group of young offenders eligible for a life sentence." It is true, as defendant points out, that the supreme court has held a sentence exceeding 40 years is a *de facto* life sentence for a juvenile. *People v. Buffer*, 2019 IL 122327, ¶ 40 ("In determining when a juvenile defendant's prison term is long enough to be considered *de facto* life without parole, we choose to draw a line at 40 years.").

¶ 140   The State initially counters that defendant forfeited this issue by failing to raise it before the trial court. We agree with the State. Under similar circumstances, this court recently found an

as-applied challenge based on evolving science raised for the first time on appeal was forfeited. See *People v. Kulpin*, 2021 IL App (2d) 180696, ¶ 64; see also *People v. Thompson*, 2015 IL 118151, ¶ 38 ("Nor does the record contain any factual development on the issue of whether the rationale of *Miller* should be extended beyond minors under the age of 18. Undoubtedly, the trial court is the most appropriate tribunal for the type of factual development necessary to adequately address defendant's as-applied challenge in this case.").

¶ 141 Moreover, we note that the supreme court has recently "forcefully, reaffirmed 18 as the age cutoff for juvenile sentencing protections in the eighth amendment context." *People v. Johnson*, 2020 IL App (1st) 171362, ¶ 14 (citing *People v. Harris*, 2018 IL 121932, ¶ 54-61). However, it also left open the possibility that such a claim was cognizable under the Illinois Constitution and held that under circumstances similar to this case, the claim was better brought in a post-conviction petition (725 ILCS 5/122-1 *et seq.* (West 2020)) or a petition for relief from judgment (735 ILCS 5/2-1401 (West 2020)) given the undeveloped nature of the record. *Id*. ¶ 48. We come to the same result here.

¶ 142                                    IV. CONCLUSION

¶ 143 In light of the foregoing, the judgment of the circuit court of Du Page County is affirmed. Given our resolution of these issues, defendant's claims concerning *Krankel* counsel being ineffective for failing to preserve them are moot.

¶ 144 Affirmed.